IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| STATE OF NEW YORK, and ) | |
| ) | |
| TUSCARORA NATION, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | CA No. 21-cv-01218-JLS |
| v. ) | |
| ) | |
| HONEYWELL INTERNATIONAL INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM IN SUPPORT OF
MOTION TO ENTER CONSENT DECREE**

The United States, on behalf of the Department of the Interior ("DOI") as a trustee of

natural resources, respectfully requests that this Court approve the proposed Consent Decree,

ECF 2-1, entered into under the Comprehensive Environmental Response, Compensation, and

Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA").  The Consent Decree was filed on

November 15, 2021, and it provides a favorable resolution of the allegations in the Complaint,

ECF 3.  The proposed settlement provides for payment of $4,250,000 and preservation of

approximately 70 acres of undeveloped land in downtown Buffalo, New York, to compensate for

injuries to natural resources resulting from the release of hazardous substances in an approximately 6.2 mile stretch of the Buffalo River, Buffalo, New York (the "Site," as more fully defined herein). The proposed settlement addresses the CERCLA liabilities of the Defendant, Honeywell International Inc. ("Honeywell"), along with other potentially responsible parties, for compensatory damages for injuries to natural resources at the Site, including migratory birds, sediments, groundwater and other biological resources, from the release of hazardous substances. Co-Plaintiffs, the State of New York and the Tuscarora Nation, as co-trustees of natural resources, have authorized the undersigned to state that they concur in the Motion and in this Memorandum seeking approval and entry of the Consent Decree. Honeywell also consents to entry of the Decree. Consent Decree ("CD") ¶ 69, ECF 2-1.

Under the proposed Consent Decree, Honeywell will pay $4,250,000 to the natural resource trustees to compensate for injuries to natural resources at the Site. The payment will fund natural resource habitat restoration projects, restore lost recreational and cultural services provided by the injured natural resources, provide costs to oversee completion of the proposed projects, and reimburse past natural resource damage assessment costs. Most of the natural resource restoration projects will be undertaken on over 70 acres of undeveloped property along the River that, under the Consent Decree, will be protected from development in perpetuity by recording conservation easements and restrictions on the land (collectively the "Protected Property"). These Protected Properties are currently owned by CSX Transportation or the City of Buffalo, who are included within the term "Other Settling Parties," as defined under the Consent Decree.

The United States published notice of the lodging of the Consent Decree in the Federal Register on November 19, 2021. 86 Fed. Reg. 64959. That notice informed the public that comments concerning the proposed Decree could be filed with the Department of Justice

("DOJ") within thirty days thereof.  The public comment period ended on December 20, 2021.

Only one comment was received.  Comment, Exhibit ("Ex.") 1, attached hereto.

As set forth below, after considering the only public comment received, the United States

believes that the proposed Decree is fair, reasonable, and consistent with the purposes of

CERCLA.  Because the proposed Decree meets the legal standard for judicial approval of

settlement agreements, the United States respectfully requests that the Court approve the

proposed Decree as a final judgment, resolving all claims in this matter.

## I.      BACKGROUND

### A.  Statutory Framework

Federal and state laws establish a framework for recovering damages to compensate the

public when natural resources[1] are injured, lost or destroyed as a result of releases of hazardous

substances and/or petroleum.  *See*, 42 U.S.C. § 9607(a) (liability for hazardous substances),

Article 12 of the New York State Navigation Law (liability for petroleum), and common law.[2]

Various classes of persons are liable for such damages, including owners and operators of

facilities that released hazardous substances and/or petroleum that resulted in injuries to natural

resources under the relevant federal and state laws.  *Id.*  CERCLA specifies that liability for

damages as a result of natural resource injuries "shall be to the United States Government and to

any State for natural resources within the State or belonging to, managed by, controlled by, or

appertaining to such State and to any Indian tribe for natural resources belonging to, managed

by, controlled by, or appertaining to such tribe." 42 U.S.C. § 9607(f)(1).  In general, the proper

---

[1] "Natural resources," under CERCLA, include "land, fish, wildlife, biota, air, water, ground water, drinking water
supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise
controlled by the United States . . ., any State . . . [or] any Indian tribe . . . ."  42 U.S.C. § 9601(16).

[2] Although the Complaint does not allege any state law claim for damages for injuries to natural resources, the
proposed Consent Decree, with certain reservations and exceptions, provides a covenant not to sue for Natural
Resource Damages under CERCLA *and* state law.  CD Section XIII.

measure of damages for injury to natural resources is the cost of measures to restore, replace, or acquire the equivalent of the injured resources after clean-up or remedial action has been implemented or taken into account, plus compensation for public losses due to impairment of natural resources from the time of injury until restoration or recovery is complete.  *See generally, Ohio v. U.S. Dep't of the Interior,* 880 F.2d 432 (D.C. Cir. 1989); *Kennecott Utah Copper Corp. v. U.S. Dep't of the Interior*, 88 F.3d 1191 (D.C. Cir. 1996).  Under both federal and state law, recoverable natural resource damages explicitly include the reasonable costs of assessing the injuries resulting from a release of hazardous substances and/or petroleum.  42 U.S.C. § 9607(a)(4)(C), and NYS Nav Law § 181 (2) ("all direct and indirect damages, no matter by whom sustained").

CERCLA does not prescribe any method for determining natural resource damages in all cases, but CERCLA does require promulgation of federal regulations for the assessment of damages at individual CERCLA sites.  42 U.S.C. § 9651(c).  Those regulations, issued by DOI, are codified at 43 C.F.R. Part 11.  By law, any natural resource damage recovery by a trustee must be used "only to restore, replace, or acquire the equivalent of" the injured natural resources. 42 U.S.C. § 9607(f)(1).

### B.  Factual Background

Plaintiffs, the United States, the State of New York and the Commissioner of the New York Department of Environmental Conservation (collectively, the "State"), and the Tuscarora Nation (collectively, the "Plaintiffs"), filed a complaint in this action concurrently with this Consent Decree.  Complaint, ECF 3; CD, ECF 2-1.  The Complaint alleges that Honeywell is liable to the Plaintiffs under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss, resulting from the release, or threat of release, of hazardous

substances at the Site.  Complaint ¶ 1.  The Site includes an approximately 6.2 mile stretch of the Buffalo River from the mouth of the River at Lake Erie to the confluence of Cazenovia Creek, including the City Ship Canal, and the Times Beach Nature Preserve in Buffalo, New York, (collectively defined herein as the "Site").  *Id.*

Plaintiffs allege that Honeywell is the successor to, and responsible for, the environmental liabilities of Allied Chemical Corp. and Buffalo Color Corp. (collectively, "Allied Chemical/Buffalo Color"), which manufactured dyestuffs and/or organic chemicals at a facility located along the River.  *Id.* ¶ 35.  In 1988, EPA identified sites along the River, including the Allied Chemical/Buffalo Color facility, as discharging hazardous substances into the River.  *Id.* ¶ 36.  Plaintiffs further allege that a portion of the former Allied Chemical/Buffalo Color facility was used from 1905 to 1974 for disposal of chemical wastes.  *Id.* ¶ 37.  In addition, from 1967 to 1971, process and cooling waters contaminated with hazardous substances were discharged from the facility directly into the River.  Hazardous substances released from the facility are present in the River sediment, and underlying groundwater.  *Id.*

DOI acting through the United States Fish and Wildlife Service ("USFWS"), the Commissioner of Environmental Conservation acting through the New York State Department of Environmental Conservation ("NYSDEC"), and the Tuscarora Nation (collectively, the "Trustees"), under the authority of Section 107(f)(2) of CERCLA, 42 U.S.C. § 9607(f)(2), and 40 C.F.R. Part 300, serve as trustees for natural resources for the recovery of damages for injury to, destruction of, or loss of natural resources under their trusteeship.  The Trustees share trusteeship of various natural resources injured at the Site from the release of hazardous substances and/or petroleum by multiple potentially responsible parties.  Complaint ¶ 21.

Investigations conducted by the Trustees and the United States Environmental Protection

Agency ("EPA") detected hazardous substances and/or petroleum in the sediments, soils, and waters of the Site, including, but not limited to, polychlorinated biphenyls ("PCBs"), polycyclic aromatic hydrocarbons ("PAHs"), metals, aniline, and benzene, toluene, ethylbenzene, and xylenes ("BTEXs").  CD at 1 ¶ D, ECF 2-1.  In response to the contamination, the Buffalo River Restoration Partnership, including the EPA, the United States Army Corps of Engineers ("ACE"), NYSDEC, Buffalo Niagara Riverkeeper ("Riverkeeper") and Honeywell developed plans for a comprehensive cleanup of the Site that included two environmental dredging projects.  *Id.* at 1-2 ¶ E.  The first project, Phase 1, begun by ACE in 2011, removed an estimated 372,000 cubic yards of contaminated sediments in the federal navigation channel using funds from the Great Lakes Restoration Initiative.  *Id.*  EPA, the Riverkeeper, and Honeywell entered into a Project Agreement under the Great Lakes Legacy Act ("GLLA") to conduct Phase 2 of the sediment remediation in the Buffalo River ("River"), including certain habitat restoration at the Site.  *Id.*  Work under this Project Agreement included dredging and disposal of approximately 500,000 cubic yards of contaminated sediment outside of the navigation channel, capping 50,000 cubic yards of contaminated sediment, and creation/restoration of eight acres of aquatic habitat in the River.  *Id.*

The Trustees considered the value and compensation of the aquatic habitat restoration work in their assessment of natural resource damages at the Site, including mitigation for the remedial dredging work itself.  *Id.*  The Trustees engaged in natural resource injury studies, damage assessment, and restoration planning relating to the Site since as early as 2004 in accordance with 43 C.F.R. Part 11.  *Id.* at 2 ¶ F.  In October 2009, the Trustees, Honeywell and Exxon Mobil Corporation ("Exxon") entered into a Cooperative Agreement by which Honeywell and Exxon agreed to participate and provide funding for the performance of a cooperative natural

resource damage assessment and restoration process.  *Id.*  Eventually, Exxon entered into a separate agreement with Honeywell and withdrew from the Cooperative Agreement.  Honeywell continued its cooperative engagement in the natural resource damage assessment and restoration process with the Trustees.  *Id.*

The Tuscarora Nation alleges that the Site area is historically and culturally important to the Tuscarora Nation and the Haudenosaunee Confederacy.  CD at 2 ¶ G.  The Site area includes several known points of historic and cultural importance to the Tuscarora including the Seneca Council House, Seneca Indian Academy, and Haudenosaunee gravesites.  *Id.*  The Tuscarora claim that, in addition to the direct injuries to natural resources caused by contamination of the River, generations of the Tuscarora people have been prevented from using the River for traditional cultural activities as a result of the natural resource injuries.  *Id.;* Restoration Plan at 12 (citations to the Restoration Plan are to the page numbers on the physical copy, not the PDF page numbers), Ex. 2.  It is the goal of the Tuscarora Nation to protect and restore these relationships between the natural resources of the Buffalo River and the cultural services they provide.  Restoration Plan at 12, Ex. 2 (https://www.fws.gov/northeast/nyfo/ec/buffalo.htm).

To compensate for the natural resource injury, the Trustees prepared a draft Restoration Plan and Environmental Assessment for the Buffalo River ("Restoration Plan") consistent with 43 C.F.R. §§ 11.81 and 11.93.  *Id.*  The Restoration Plan, which was subject to a public comment process, proposes several preferred restoration projects to compensate for natural resource injuries at the Site, with the top three projects being natural resource restoration work on land owned by the City and by CSX Transportation, Inc. ("CSXT").  Restoration Plan at 33.  These preferred restoration projects will occur on portions of approximately:

(1)   43-45 acres of CSXT undeveloped land, bisected by an active railroad line, abutting the River and known generally as Concrete Central;

(2)   7-9 acres of CSXT partially undeveloped land, abutting the City Ship Canal and known generally as the CSXT City Ship Canal Property; and

(3)   22 acres of the City's undeveloped Houghton Park land abutting the River, together with approximately three acres of contiguous undeveloped riverfront City-owned upstream parcels, and known generally as Houghton Park and the Upstream Parcels.[3]

The Restoration Plan proposes these properties for stream bank enhancements, invasive species removal, native plantings, wetland creation, and/or (in certain locations) for recreational enhancements to compensate for lost natural resources and services.  Restoration Plan at 24-27, 33.  The Restoration Plan and the Consent Decree call for a conservation easement and restriction to be recorded on these properties to protect the restoration work and prevent the properties' development in perpetuity.  *Id.*; CD at 7, "Protected Property" definition.

## II.  Proposed Consent Decree

The proposed Decree resolves all claims in this matter, and involves parties not named in the Complaint.  The Consent Decree structure includes individual participation by Honeywell, CSXT, the City of Buffalo (the "City") and Other Settling Parties as follows:

(1)   Honeywell will make monetary payments as set forth in Section VI ("Payments by Honeywell") in the total amount of $4,250,000 and Paragraph 17(a) ("closing costs") to

---

[3] *See* respectively, (1) Restoration Plan at 24-25; CD at 5, "Concrete Central" definition; (2) Restoration Plan at 25-26, CD at 5, "CSXT Ship Canal" definition; and (3) Restoration Plan at 26-27, 33; CD at 5, 8, "Houghton Park", "Upstream Parcels" definitions.

reimburse assessment costs and to fund certain restoration work to restore, replace and acquire the equivalent of the injured natural resources according to the Restoration Plan and the Decree;

(2)   CSXT, another potentially responsible party for natural resource damages under CERCLA ("PRP"), will grant conservation easements and restrictions to preserve portions of CSXT's City Ship Canal and Concrete Central Properties as Protected Property in their undeveloped condition in perpetuity, as specified in the Restoration Plan and as substantially set forth in Appendix C.1 and C.2 of the Decree;

(3)   the City, another PRP, separately agreed with Honeywell to authorize Honeywell to record conservation easements and restrictions to preserve portions of Houghton Park and the contiguous Upstream Parcels as Protected Property in their undeveloped condition in perpetuity, as specified in the Restoration Plan and Appendix E of the Decree; and

 (4)   the Other Settling Parties consist of ten PRPs listed in Appendix B that have made payments to Honeywell for cleanup work and natural resource damages, or otherwise offered consideration to Honeywell, concerning the Site under prior separate settlements with Honeywell.  These parties need not sign the Decree because they owe no obligation to the Plaintiffs, except for CSXT, which has signed the Decree, as it remains responsible for executing the conservation easements and restrictions for its Protected Properties.

Under the Decree's proposed conservation easements and restrictions, the Protected Properties, which represent over 70 acres of undeveloped land, will be preserved in their undeveloped condition in perpetuity.  CD at 2-3, I, ¶ 18, Appendices C and E.  Figure 1 below depicts the area and location of the Protected Property.



**Figure 1: Depicting Protected Property (Adapted from the Restoration Plan Figure 3a)[4]**

Honeywell does not admit any liability to the Plaintiffs arising out of the transactions or occurrences alleged in the Complaint, nor do Honeywell or CSXT admit or endorse any fact and/or conclusion in the Restoration Plan.  CD at 3 ¶ L.  Both Honeywell and CSXT consent to the entry of the Consent Decree.  CD at ¶ 69.

**III.     Standard of Review**

Courts recognize "a strong federal policy favoring the approval and enforcement of consent decrees." *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991); *see also Citizens for a Better*

---

[4]  Not all of the properties considered for protection under the Restoration Plan as depicted in Figure 3a. of the Restoration Plan were available for protection or the other depicted properties were ranked below the three preferred projects depicted above on Figure 1.  Restoration Plan at 18, 33.

*Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983).  In reviewing a proposed consent decree involving an enforcement agency, a district court must "determine whether the proposed consent decree is fair and reasonable, with the additional requirement that the 'public interest would not be disserved,' in the event that the consent decree includes injunctive relief." *SEC v. Citigroup Glob. Markets, Inc.*, 752 F.3d 285, 294 (2d Cir. 2014) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "Absent a substantial basis in the record for concluding that the proposed consent decree does not meet these requirements, the district court is required to enter the order." *Id.*

"Consent decrees are primarily about pragmatism." *Id.*  They are products of compromise and risk management, based on the litigants' assessment of numerous factors including "the value of the particular proposed compromise, the perceived likelihood of obtaining a still better settlement, the prospects of coming out better, or worse, after a full trial, and the resources that would need to be expended in the attempt." *SEC v. Citigroup Glob. Markets, Inc.*, 752 F.3d at 295 (quoting *Citigroup*, 673 F.3d at 164).  "These assessments are uniquely for the litigants to make." *Id.*  Accordingly, the court ought not to inquire into "whether the settlement is one which the court itself might have fashioned, or considers as ideal." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990).

Where a consent decree "is the result of settlement negotiations between a federal administrative agency and a private entity," courts give particular deference to "the agency's expertise and the voluntary agreement of the parties in proposing the settlement." *Town of Ft. Edward v. United States*, No. 06-5535-CV, 2008 WL 45416, at *1 (2d Cir. Jan. 3, 2008) (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 118 (2d Cir. 1992)); *see also Cannons*, 899 F.2d at

84 (discussing judicial deference where "a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement").

## IV.     The Consent Decree Meets the Standard for Entry.

The proposed Consent Decree is fair, reasonable, and consistent with the public interest. The proposed Consent Decree appropriately compensates the public for injuries to natural resources resulting from releases of hazardous substances at or from Honeywell's former manufacturing facility prior to the date of lodging of the Consent Decree, while avoiding the need for complex litigation.  In addition, the proposed settlement provides a reasonable resolution of potential claims by Honeywell for contribution against a group of PRPs, providing broad repose against future litigation of complex contribution claims relating to natural resource damages.  Accordingly, the Court should enter the proposed Consent Decree because it resolves the claims in the Complaint in a manner that is fair, reasonable, and consistent with the public interest.

### A.  The Consent Decree is Fair, Both Procedurally and Substantively.

"To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance."  *Cannons*, 899 F.2d at 86; *Arizona v. Nucor Corp.*, 825 F. Supp. 1452, 1456 (D. Ariz. 1992) *aff'd sub nom. Arizona v. Components Corp.*, 66 F.3d 213 (9th Cir. 1995) (quoting *Cannons*).  The courts have held that a settlement is entitled to a presumption of validity where it is negotiated at arm's length by experienced counsel with adequate information to evaluate the strengths and weaknesses of the case.  *See, e.g., Cannons*, 899 F.2d at 84.  Indeed, "[t]o the extent that the process was fair and full of 'adversarial vigor,' the results come before the court with a much greater assurance of substantive fairness."  *United States v. Montrose Chem. Corp.*, 793 F. Supp. 237, 240 (C.D. Cal. 1992).  The proposed Consent Decree in this action was the product of good faith, arms-length

negotiations, over an extended period of time, among parties with adverse interests.  All parties

to the settlement were represented by experienced counsel.

 As an additional safeguard of procedural fairness, the proposed Consent Decree was

publicly lodged with the Court, and the public was notified of an opportunity to comment

through a notice published in the Federal Register.  86 Fed. Reg. 64959 (Nov. 19, 2021).  Public

comment was also invited on the draft Restoration Plan.  *See* US Fish & Wildlife Service

website: https://www.fws.gov/northeast/nyfo/ec/buffalo.htm.  No one challenged the fairness of

the Restoration Plan or the negotiation process during the public comment period on the

proposed settlement or the Restoration Plan.  The Court should conclude that the settlement

process was procedurally fair.

 The proposed Consent Decree is also substantively fair.  As discussed in more detail

below in Subsection B, the Consent Decree provides for implementation and funding of natural

resource restoration projects on Protected Properties and the protection of those Properties in

perpetuity.  The chosen projects are consistent with restoration criteria established and published

by the Trustees, and represent preferred projects selected in the Restoration Plan to compensate

for natural resource losses through instream and stream bank, wetland, and upland restoration,

land preservation, and natural resource-based public use enhancement.  Restoration Plan at 22-

23, 33, Ex. 2.  In return for Honeywell's payments and work recording the conservation

easements and restrictions, and for CSXT's and the City's agreement to allow Honeywell to

record the conservation easements and restrictions on their Protected Property, the Consent

Decree provides Honeywell, CSXT, and the City with significant repose with respect to potential

liability for damages arising from releases that occurred prior to the time the Consent Decree was

lodged with the Court.  *See*, CD ¶50, ECF 2-1.

Although no party secured everything it might have secured through litigation, all parties concluded that the compromise embodied in the settlement is preferable to the uncertainties and expense of complex litigation that would necessarily delay the onset of restoration of natural resources.  As discussed below, the proposed settlement provides for implementation of a suite of natural resource restoration projects to compensate the public for alleged injuries to natural resources, as well as provide for reimbursement of natural resource damage assessment costs.

During the public comment period on the proposed settlement, the only comment received questioned the substantive fairness of the proposed resolution of the natural resource damage claims against Honeywell.  The comment essentially argues that the natural resource restoration projects are insufficient and that Honeywell should pay more to resolve its liabilities since it is a wealthy company and greater deterrence is required.  Comment at 2.  This comment is misplaced for several reasons and should not prevent the entry of the Consent Decree.

First, the Commenter underestimates the value of the natural resource restoration projects, including the preservation of more than 70 acres of undeveloped land along the River in the heart of the city.  Comment at 5 (faulting the proposed setting for being "surrounded by polluted water and urban development").[5]  The Trustees did consider a larger property for conservation, namely a 222-acre headwater forest in Wales, New York.  Restoration Plan at 30-31.  That property, however, is 20 miles from the Site, and therefore provides fewer local restoration benefits and opportunities for public enjoyment than projects within the impacted Site.  *Id*.  In fact, the selected projects are highly valued because there are limited urban restoration projects within the City of Buffalo and they benefit wildlife and other natural resources, such as water quality and

---

[5]  The Commenter provides no evidence about the current environmental condition of the Buffalo River water following the work under the Great Lakes Legacy Act to clean it up, including dredging and capping portions of contaminated segments.  CD at 1-2 ¶ E.

riparian habitat, directly in the setting where the injury occurred. *Id.* at 33.  Further, the

Commenter appears to believe that public access to the Protected Property is limited to 7 acres.

Comment at 2, 5.  This is incorrect: together, the Ship Canal and Houghton Park Properties will

be open to the public, and include trails and other recreational amenities, on a total of

approximately 29 acres.  CD at 5-6, "Houghton Park", "CSXT Ship Canal" definitions.  While it

is true that the Concrete Central parcel is currently bisected by an active rail line, and that

therefore it would be unsafe to allow the public onto this property, this Protected Property will

be preserved forever as valuable haven to benefit avian, fisheries, amphibian and reptile

populations as a result of the settlement.  Moreover, this Protected Property provides a green

corridor between the Tifft Nature Preserve to the south and Red Jacket River Front Park to the

north, linking a variety of natural habitats such as instream, mudflat, wetland, riparian edge,

floodplain and uplands.  Restoration Plan at 24-25.  The Comment fails to acknowledge that

there are no other readily available undeveloped unprotected properties of this magnitude in

downtown Buffalo.

Second, the Commenter discounts the potential litigation risks inherent in pursuing and

quantifying a natural resource damage claim against one PRP in an industrialized river with

multiple PRPs, where damages are measured decades after the initial contamination and

industrialization of the River beginning as early as the 1900s.  Comment at 4 (although the

settlement would "help to avoid further [transaction] costs and the time of litigation," those costs

are allegedly outweighed by the alleged harms).  However, the Commenter does not quantify the

extent of any particular resource injury, to identify who released what hazardous substances, or

to assess the value of the injured resource.  The Commenter instead provides generalizations and

conclusory statements to contend the settlement is inadequate.  Comment 1, 8.  Bare statements

that an environmental settlement is unfair, however, without specifics or otherwise pointing to

particular record references, are not enough to upset a consent decree.  *See United States v. Comunidades Unidas Contra la Contaminacion Comunidades Unidas*, 204 F.3d 275, 281 (1ˢᵗ Cir. 2000) (citing *United States v. District of Columbia*, 933 F. Supp. 42, 48-49 (D.D.C. 1996)).  In contrast, the Trustees developed an administrative record documenting their assessments of injury and service losses and scoping of restoration opportunities as reflected in the Restoration Plan.  Restoration Plan at 7, 33.  Based on this information, the Trustees determined that the proposed projects and payments are a fair compromise and resolution in an effort to make the public whole for the injuries to natural resources caused by the historic release of hazardous substances, given the litigation risks associated with trying the complex case.

Third, the Commenter argues that the settlement should have included more money or restoration projects as a deterrent to Honeywell.  But deterrence is not a relevant consideration under the governing law.  CERCLA concerns the cleanup of contaminated sites and compensation to make the public whole for harm caused by the hazardous substances found at those sites – there is no punishment component available in this case.  42 U.S.C. § 9607(a).  In contrast, the Clean Air Act, 42 U.S.C. § 7524, the Safe Drinking Water Act, 42 U.S.C. § 300j-6(b), the Clean Water Act, 33 U.S.C. § 1344, and the Oil Pollution Act, 33 U.S.C. § 1321(b)(6), all provide for civil penalties for violations of their respective provisions.  With limited exceptions concerning noncompliance with administrative cleanup orders, *see*, e.g., 42 U.S.C. §§ 9606(b)(1), 9607(b)(3), CERCLA has no such provisions.  Accordingly, the deterrence approach the Commenter recommends is unavailable under the controlling law for this proposed settlement.

Fourth, the Commenter does not credit the contributions of Honeywell to the cost of cleaning up the River through the separate Great Lakes Legacy Act program.  While federal funding through the Great Lakes Legacy Act assisted the PRPs in cleaning up the River,

16

including the cost of dredging and removal of contaminated sediments, Honeywell agreed to split

the costs 50/50 up to spending $24 million of the $48 million for this clean-up work.  CD at 1-2 ¶

E; website: https://www.dec.ny.gov/chemical/54166.html.  This joint effort resulted in projects

that have remediated more than 1 million cubic yards of contaminated sediment from the lower

six miles of the Buffalo River and City Ship Canal.  https://www.epa.gov/great-lakes-

aocs/buffalo-river-aoc.  To the extent that the Commenter believes that "the people of the United

States should not have to supplement the profits of a multibillion dollar company by cleaning up

their pollution," the comment is at odds with the Great Lakes Legacy Act program and

Congressional intent.   Thus, the Commenter does not acknowledge Honeywell's financial

contributions to cleaning up the Buffalo River Site outside of this proposed settlement.

Finally, the Commenter alleges that Honeywell has caused pollution at other sites around

the country.  Comment at 1-2.  That, however, is irrelevant to this case, the statute under which

the case arises, and the relief that can fairly be provided by the proposed Decree.  Here, the focus

is limited to whether the Decree is a procedurally and substantively fair resolution of CERCLA

claims against Honeywell and other PRPs concerning natural resource damages at *this* Site,

taking into account all parties' litigation risk and desire for resolution of this complex matter.

### B.  The Consent Decree is Reasonable, Adequate, and Consistent with the Public Interest.

As explained below, the proposed settlement should be approved because it is reasonable,

adequate and consistent with the public interest.

The Consent Decree includes several requirements to compensate the public for alleged

injuries to natural resources resulting from releases of hazardous substances from the former

manufacturing facility owned and operated by Honeywell's predecessor.  For example,

Honeywell agrees to: (1) record conservation easements and restrictions on more than 70 acres of

undeveloped Protected Property along the Buffalo River; (2) pay $2,993,485 to restore and replace injured natural resources and their recreational services on the Protected Property; and (3) pay $1,256,515 to reimburse costs of assessing natural resource damages incurred by the United States in the amount of $682,100, and the Tuscarora Nation in the amount of $574,415, including the restoration of cultural services lost or damaged through the injury to natural resources.  As discussed below, these commitments provide an appropriate resolution of disputed claims that otherwise would require considerable time and resources to develop and litigate.  The Commenter's opposition to the Consent Decree on the grounds that the settlement is insufficient is based on incorrect or conclusory statements without fully considering the risks and costs of litigation.

### 1. Natural Resource Restoration Projects

The Consent Decree requires Honeywell to implement or fund a series of natural resource restoration projects that are consistent with the restoration project selection criteria identified in the Restoration Plan published by the Trustees.[6]  The restoration projects described in the Consent Decree are all components of the preferred alternative for natural resource restoration identified in the final Restoration Plan that the Trustees developed and adopted in accordance with 43 C.F.R. Part 11.  Restoration Plan at 33, Ex. 2.  The Restoration Plan identifies these projects to compensate for losses through the restoration and enhancement of instream and stream bank, wetland, and upland habitat; land preservation; and natural resource-based public use enhancements.  *Id.*

---

[6] *See* Restoration Plan at 15, Ex. 2 (describing project selection criteria) and 22 (applying the project selection criteria and preferred restoration project categories to the restoration projects identified in the Consent Decree).

### a. Honeywell will Record Conservation Easements and Restrictions on the Protected Property.

Honeywell will record several conservation easements and restrictions to preserve the Protected Property against development in perpetuity. CD ¶¶ 17-18, Appendices C and E, ECF No. 2-1. In considering the merits of the proposed settlement, the comment has not credited the value of preserving and protecting more than 70 acres of undeveloped land in downtown Buffalo. Comment at 2 (arguing that the preserved property is bisected by rail and unavailable for public access). The Protected Property constitutes more than 70 acres of land, of which approximately 29 acres will be available for public access. Restoration Plan at 25-27; CD at "CSXT Ship Canal" and "Houghton Park" definitions, Appendices C and E. The remaining acres will provide valuable riparian habitat along the River that will benefit avian, fisheries, amphibian and reptile populations. Restoration Plan at 25. Public access on the Concrete Central parcel is not appropriate at this time given safety concerns regarding an active rail line that bisects the property, Restoration Plan at 13, 25; CD ¶ 28(g), Appendix C, although the parcel is being preserved in perpetuity and may not always have an active rail line. No other comparable property exists within the Site area to provide similar environmental and recreational benefits as is offered by these 70 acres. Restoration Plan at 33, Tables 2 & 3.

### b. Honeywell-Funded Restoration Projects

Honeywell will fund additional restoration projects that will be managed by the Trustees rather than by Honeywell. *See*, CD ¶ 7 b. – h, ECF 2-1. Under the Decree, Honeywell will pay a total of $3,567,900 allocated to the following restoration projects and their oversight:

- $1,355,720 for natural resource habitat restoration projects, CD ¶ 7 b.;

- $606,710 for the Concrete Central Natural Resource Restoration Project, including stream bank, wetland, and grassland/upland restoration through invasive plant species removal and native species planting, CD ¶ 7 c., Restoration Plan at 25;

19

- $277,150 for the Houghton Park Natural Resource Restoration Project, including designing and implementing sustainable habitat and recreational compatible options, such as trails,  with the intention of stream bank, wetland, and upland restoration through invasive plant species removal and restrictions on illegal access of motorized off-road vehicles, CD ¶ 7 d, Restoration Plan at 27;

- $179,500 for the CSXT City Ship Canal Natural Resource Restoration Project, including stream bank, riparian edge, and upland restoration, through removal of invasive species and planting of native habitat, and the creation of enhanced compatible recreational opportunities, such as fishing and boating, CD ¶ 7 e, Restoration Plan at 25;

- $215,400 for oversight of the foregoing projects, CD ¶ 7 f;

- $359,005 to compensate for lost recreational use of natural resources, such as the City Ship Canal and Houghton Park projects, CD ¶ 7 g., Restoration Plan at 25, 27; and

- $574,415 for projects to compensate for lost cultural services provided by natural resources and assessment costs incurred by the Tuscarora Nation, CD ¶ 7 h, Restoration Plan at 12.

### c. Restoration Project Benefits

The natural resource restoration projects to be implemented under the Consent Decree will provide significant restoration benefits through enhancing and preserving native habitat to support diverse native biological resources, as well as by providing increased opportunities for recreational use and enjoyment of natural resources, all in an urban setting.

The Commenter criticizes the settlement for the fact that the Protected Property is "chopped up" and "surrounded by polluted water and urban development."  Comment at 5. However, it is one of the quintessential benefits of the settlement that it will restore natural resources and their services, even in an urban setting where the injuries occurred.  Further, the Protected Properties are adjacent to the Buffalo River and therefore ecologically and hydrologically connected to other preserved properties along the River and the Buffalo Outer Harbor.  More specifically, the Protected Properties and natural resource restoration projects to

be implemented on those Properties are not in isolation but are ecologically and hydrologically connected to the Tifft Nature Preserve (adjacent to the City Ship Canal Protected Property, Restoration Plan Figure 1), Red Jacket Park (directly across the River from Concrete Central, Restoration Plan Figure 4), and the Seneca Bluffs habitat restoration project (located downstream on the southern bank of the River from the Houghton Park Protected Property, Restoration Plan at 27). *See also* Figure 1, above at 9. In other words, the Commenter is mistaken that the Protected Properties are chopped up and, therefore, are failing to provide connectivity benefits to other existing protected natural land. In fact, the settlement represents a unique and rare opportunity to increase habitat connectivity within an urban setting along the River shoreline.

The benefits of this connectivity are enhanced by the improvements to the natural resource values of the Protected Properties within the City limits. The Ship Canal, Concrete Central, and Houghton Park restoration projects include provisions for converting areas currently overrun by invasive species into native natural habitats for the benefit and diversification of native wildlife, such as pollinators. CD Appendices C and E. And these enhanced connectivity benefits will be preserved in perpetuity on over 70 acres of undeveloped land through the conservation easements and restrictions. *See, id.* (collectively preserving more than 70 acres of undeveloped land in the urban floodplain of the Buffalo River).

The Commenter also does not acknowledge the enhanced benefits the projects provide by fostering increased human use and enjoyment of natural resources within the same urban setting. For example, the Ship Canal project would increase public access to the water and Outer Harbor by providing opportunities for recreational fishing and boating through construction of additional facilities that support fishing and boating activities. CD Appendix C 2 at section 3.3, ECF 2-5 at 5 (providing for fishing platform and hand held boat launch located near the mouth of the

21

Buffalo River as an element of larger restoration projects).  Similarly, the Houghton Park project will provide enhanced public access through trail improvements and invasive species control. CD Appendix E 1 at section 4.5, ECF 2-7 at 10, Restoration Plan at 27.  In other words, both the Houghton Park and Ship Canal restoration projects include amenities to support recreational use and enjoyment of natural resources in the same setting where the injury occurred.  *See, id*.  These projects will benefit (and be accessible to) the citizens and diverse communities within the City of Buffalo, including members of the Tuscarora Nation.  No other properties were available to provide comparable benefits.

Finally, the Commenter does not recognize the benefits of the settlement to the Tuscarora Nation.  Within this same urban setting, the Consent Decree will support restoration of natural resources and the cultural services they provide to the Tuscarora Nation through funding for projects such as cultural site protection and property acquisition, language restoration, interpretation and heritage tourism, and agricultural restoration.  Such programs will protect existing and future cultural resources and help educate the general public about Haudenosaunee history in the Site area.  Restoration Plan at 12.  The Tuscarora Nation will not only benefit from the cultural and ecological restoration projects that it directly undertakes, but as a member of the Trustee Council it will work cooperatively with the other Trustees to design and implement ecological restoration projects.  In doing so, the settlement will help uphold a cornerstone of Haudenosaunee belief that humans borrow the earth from our children's children and that it is our duty to protect it for future generations.

## 2.   Reimbursement of Assessment Costs

The proposed resolution requires Honeywell to make payments to the federal and Tuscarora Nation Trustees to cover the costs of assessing the amount of natural resource

damages.  CD ¶¶ 7.a., h., ECF No. 2-1.  Honeywell will pay $682,100 in assessment costs previously incurred by federal Trustees, and a portion of the $574,415 paid to the Tuscarora Nation may be used to compensate for past assessment costs incurred by the Tuscarora Nation. *Id.*  The Commenter suggests that the money recovered under the Decree for assessment costs, however, should have been spent on restoration projects instead, including for cultural or recreational uses.  Comment at 4.  But, recovering assessment costs is consistent with 42 U.S.C. §9607(a)(4)(C).  Such recoveries promote statutory objectives and the public interest by replenishing monies that can be used to fund assessment activities at other sites where releases have occurred, and thus support efforts by natural resource trustees to further recover compensation for damages to natural resources.  Without assessment, and a basis for alleging injury, there can be little justification for projects.

### 3.   The Benefits of Litigation Avoidance

In arguing that this settlement is inadequate, the Commenter does not appreciate the need for the parties to assess litigation risk in this matter.  The proposed Consent Decree does not include an admission by Honeywell or any other PRP that it is liable to Plaintiffs for any damages to natural resources that resulted from releases at the Site.  Absent settlement, Honeywell would likely assert certain defenses it contends would shield it from liability altogether, as well as arguments contesting the magnitude of any damages that might be assessed against Honeywell.  Many of these arguments would present complex issues of law or fact, the outcome of which cannot be predicted with a high degree of certainty.  As a result, the parties have reasonably concluded that a negotiated resolution is preferable to the risks and delays of a litigated outcome.

Further, Honeywell and Plaintiffs hold differing views regarding the interpretation and application of multiple sections of CERCLA to the circumstances of this case, including but not limited to how principles of joint and several liability apply in the context of an industrialized river with historic contamination dating back to the early 1900s.  The parties also differ on the estimated magnitude of injuries resulting from releases at or from Honeywell's predecessor's former manufacturing facility, and the benefits provided by in-river habitat restoration work already implemented by Honeywell as part of the Great Lakes Legacy Act clean-up.  If litigated, these disagreements would require the parties to ask a court to resolve, *inter alia,* complex questions involving allocation of damages and differing expert-backed analyses and conclusions regarding impacts to ecological services from contamination, restoration projects, and recovery rates of resources in the future.  Under these circumstances, a negotiated resolution of the claims that promotes early restoration of natural resources and avoids the cost and uncertainties of litigation is reasonable.  *See, Acushnet River & New Bedford Harbor*, 712 F. Supp. at 1032 ("this Court imagines that defendants will generally settle for substantially less – indeed, often for far less given the inherent problems of proof in these cases – than the asserted [natural resource] damages").

## CONCLUSION

For the foregoing reasons, the proposed Consent Decree is fair, reasonable, and in the public interest.  Therefore, the United States requests that this Court sign and enter it as a final judgment, resolving all claims in this matter.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA:**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice

2/16/2022                               _/s/ *C. A. Fiske*_____
Dated                                   CATHERINE ADAMS FISKE
                                        Senior Counsel
                                        U.S. Department of Justice
                                        Environment and Natural Resources Division
                                        Environmental Enforcement Section
                                        408 Atlantic Avenue – Suite 236
                                        Boston, MA 02110
                                        (617) 748-3399
                                        Addie.Fiske@usdoj.gov

                                        TRINI E. ROSS
                                        United States Attorney
                                        Western District of New York

                                        MARY K. ROACH
                                        Senior Litigation Counsel
                                        138 Delaware Avenue
                                        Buffalo, NY 14202
                                        (716) 843-5700

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on today's date, a true and accurate copy of the above document, which was filed via the court's ECF system, will be sent electronically by the ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF) and an electronic copy will also be sent to counsel to Honeywell, Daniel Cantor, at the following address: Daniel.Cantor@arnoldporter.com

*/s/ C. A. Fiske*

Catherine Adams Fiske